759 So.2d 483 (2000)
Ronald J. WALLS a/k/a Ronald Joseph Walls, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01019 COA.
Court of Appeals of Mississippi.
March 14, 2000.
*484 David O. Bell, Oxford, Attorney for Appellant.
Office of the Attorney General by Deirdre McCrory, Attorney for Appellee.
EN BANC.

ON MOTION FOR REHEARING
McMILLIN, C.J., for the Court as to Part I, IRVING, J., for the Court as to Part II:
¶ 1. On motion of the appellant, Ronald J. Walls, rehearing is granted. The original opinion issued by the Court is withdrawn and the following opinion is substituted therefore.
¶ 2. This is an appeal from a criminal conviction of aggravated assault. The defendant, Ronald Walls, was tried on two criminal counts. One count involved a charge of kidnaping, for which he was acquitted. The other count was the aggravated assault charge arising out of the same incident, for which Walls now stands convicted. Walls raises two issues on appeal. First, he claims that the trial court erred in denying him a lesser-included offense instruction on simple assault. Secondly, he alleges that he was improperly sentenced as a habitual offender because his two prior felony convictions did not *485 arise out of separate incidents occurring at different times. This Court finds the first issue to have merit and we, therefore, reverse and remand for a new trial. Because proper sentencing may again be an issue on retrial, this Court has considered the second issue as well, and has determined that, for reasons to be set forth hereafter, it would be error to sentence Walls as a habitual offender.

FACTS
¶ 3. According to the State's proof, Walls forced his way into the home of another person where his former girlfriend, Judy Kesler, was temporarily residing. At the time, Kesler was alone at the residence. According to Kesler's testimony, Walls physically assaulted her with his fists, drug her around the residence by her hair, and then beat her about the head with a knife, using the handle of the knife as a blunt instrument. He then forced her to leave the residence and took her to an abandoned trailer where he had apparently been staying. Walls forced her to remain there against her will as he pleaded with her for forgiveness and for a reconciliation in their relationship. Kesler's new companion returned home and, finding Kesler gone and seeing signs of a struggle, alerted the police. The police were able to locate Walls and Kesler at the trailer where Kesler was liberated and Walls was placed under arrest.
¶ 4. He was subsequently indicted, tried, and convicted of aggravated assault. The indictment further charged that Walls should, if convicted, be sentenced as a habitual offender because he was already the subject of two previous felony convictions, alleged by the State to have arisen out of separate incidents at different times for which he was sentenced to separate terms of one year or more. Walls unsuccessfully resisted efforts to sentence him as a habitual offender by conceding the two previous felony convictions but contending that they both arose out of the same incident.
¶ 5. We will now proceed to consider the two issues raised by Walls in this appeal.
McMILLIN, C.J., for the Court as to Issue I:

I.

The First Issue: Failure to Grant a Simple Assault Instruction
¶ 6. At the close of the evidence, Walls's counsel orally requested that the trial court give a lesser-included offense instruction on simple assault. The trial court refused the request. It is unclear from the record whether the court's refusal was based on (a) the form of defense counsel's proposed instruction (which was never formally filed or made a part of the record), or (b) the trial court's conclusion that the evidence would not support giving such an instruction in any form. Defense counsel requested the trial court to clarify the basis for its ruling. In response to that request, the trial court said only, "I am going to deny your request for [a] lesser included offense instruction."
¶ 7. The State, on appeal, attempts to interpose a procedural bar to our consideration of this issue by faulting defense counsel for his failure to submit a proposed instruction in writing. In support of its position, the State cites Conner v. State, 632 So.2d 1239, 1254 (Miss.1993), overruled on other grounds. We disagree with the State's argument on this point. In Conner, the Mississippi Supreme Court found that the "defense tendered no instruction defining simple murder, nor did it ask the trial court to explain to the jury that it could convict the defendant of a lesser crime than capital murder." Id. It seems clear to this Court that the trial court's decision against a lesser-included offense instruction in this case was made after the defense at least made a tentative tender of an instruction and after defense counsel had repeatedly asked the trial court to instruct the jury on simple assault. Though defense counsel's request for a *486 lesser crime instruction was perhaps untimely under the rules of procedure, there is no question that the matter was squarely presented to the trial court for decision. In the face of the trial court's ruling, the act of actually tendering a written instruction that was foreordained to be rejected, no matter what its form, would have been an empty gesture. Procedural considerations in matters such as this are intended to see that vital issues are properly preserved for appellate review on their merits. To interpose a procedural bar in this instance would have the opposite effect.
¶ 8. Thus, we must reach the substantive issue of whether, on this record, Walls was entitled to a lesser-included offense instruction on simple assault. In deciding that question, we note that we are constrained to view the evidence in a manner most favorable to the appellant. Fair-child v. State, 459 So.2d 793, 801 (Miss. 1984). Walls was indicted under language that charged that he "attempt[ed] to cause bodily injury to Judy Kesler with a deadly weapon, to-wit: a knife, by beating the said Judy Kesler with the said knife on the back of the head...." This language is sufficient to charge aggravated assault under Section 97-3-7(2) of the Mississippi Code (Supp.1998). Walls argues on appeal that the evidence would also support a conviction for simple assault under Section 97-3-7(1)(Supp.1998) if the jury found that he "attempt[ed] to cause or purposely caus[ed].. bodily injury to another," but concluded that use of a deadly weapon was not involved.
¶ 9. His argument is apparently based on the fact that, under the State's theory of its case, the knife constituting the "deadly weapon" necessary to implicate the more serious offense was not unequivocally a deadly weapon based on the manner in which it was used. Walls argues that, since the knife was not used to inflict injury in the manner one would normally associate with a knife assault, there was a legitimate issue of fact as to whether the knife was a deadly weapon. We conclude that this argument has merit. A knife is a device whose designed purpose, when used as a weapon, is to cut or stab. There is no evidence in this record that Walls attempted to inflict any injury on Kesler in this manner. Rather, the proof is uncontradicted that he used the knife handle solely as a blunt instrument to strike blows to Kesler's head. There was no proof that this knife was constructed in such a way that the handle constituted a particularly dangerous bludgeoning tool. Even though Kesler was immediately transported to a doctor for examination, there was no evidence that she suffered from any substantial head injuries as a result of blows administered by Walls with the knife handle. For purposes of our analysis, the method in which this knife was allegedly used renders it essentially indistinguishable from any other blunt instrument capable of being wielded as a weapon. Thus, we find the cases relied upon by the State to argue against the propriety of a simple assault instruction, once the use of a deadly weapon is established, to have little relevance. For instance, the State cites Jackson v. State, in which Jackson was convicted for stabbing two people, but complained because he was not given a simple assault instruction on the theory that he could have stabbed his victims negligently. Jackson v. State, 684 So.2d 1213, 1230 (Miss.1996). In rejecting Jackson's argument, the Mississippi Supreme Court said that "[o]nce a deadly weapon is introduced, the distinction between simple and aggravated assault ... hinges upon whether the injuries were inflicted negligently or intentionally." Id. It went on to conclude that Jackson had produced no evidence to support a contention that his actions were negligent rather than wilful. Id. Thus, the Jackson case does not deal with whether some alternative use of a knife besides to stab or cut the victim may render it less than deadly in those particular circumstances. We interpret the quoted passage from the Jackson case to encompass only those circumstances where the deadly weapon is used to inflict injury in the *487 manner which, by design, necessarily made the weapon a deadly instrument.
¶ 10. Certainly, many instruments are, by their very construction, capable of being used to produce injury by some alternative means besides their primary intended purpose. A pistol, for instance, may be used as a bludgeon instead of an instrumentality to fire a deadly projectile, and may, if put to that alternative purpose, constitute a deadly weapon. See Griffin v. State, 540 So.2d 17 (Miss.1989). Nevertheless, when an instrumentality is put to some alternative use (such as a bludgeon), it would appear that the question of whether it is a "deadly weapon" for purposes of our aggravated assault statute must turn on (a) the method in which it was used and (b) the instrumentality's inherent effectiveness for use in that manner. In some instances, the effectiveness of an instrumentality to inflict injury when used in a particular manner may be so self-evident that reasonable jurors could not disagree as to whether the weapon was deadly. Such an example might be when the victim is mercilessly bludgeoned with a tire iron. In other situations, there may be a legitimate issue of disputed fact as to whether or not an instrumentality used in a particular way constituted a deadly weapon. In such a case, it would be necessary to submit that question to the jury for resolution, and the proper method to do so would, of necessity, include the possibility of a conviction for simple assault should the jury decide the issue of "deadliness" against the prosecution. By way of example, the supreme court has held that fists or a shoe-clad foot may, depending on the facts, constitute deadly weapons. See Pulliam v. State, 298 So.2d 711, 713 (Miss.1974).
¶ 11. In this case, we have reviewed the testimony of the victim regarding the manner in which she was assaulted by Walls, and we have reviewed the photographs made exhibits to the record that include pictures of the knife brandished by Walls. Based on that review, we are unable to say, with the requisite certainty needed to affirm the conviction, that this knife, when used in the manner testified to by State's own witness, was a deadly weapon as a matter of law. Whether the handle of this knife, when used as a bludgeoning tool, was so capable of producing serious bodily injury as to constitute a deadly weapon within the meaning of Section 97-3-7(2) was, at best, a question to be resolved by the jury and not the trial court.
¶ 12. Having made a timely request, though perhaps not a procedurally perfect one, for a simple assault instruction that would have permitted the jury to ponder the question of the deadly nature of the knife when used in the manner Walls used it, and having had that request denied, Walls was deprived of a right in his defense that has, in a long line of cases, been held essential to a fair trialthe right to a lesser-included offense instruction when the evidence is such that a reasonable juror could not exclude the lesser-included-offense beyond a reasonable doubt. Harbin v. State, 478 So.2d 796, 799 (Miss.1985).
¶ 13. We, therefore, conclude that this case must be reversed and remanded for a new trial in which the jury is properly instructed on the issue of whether this particular knife, when used as a bludgeoning device rather than a cutting or stabbing tool, was so capable of producing grave bodily injury that it would necessarily be considered a deadly weapon. Of necessity, submitting this issue for resolution by the jury gives rise to the possibility that the jury would conclude that all elements of the indictment were proven except for the deadly nature of the assault device, and, in that case, a conviction for the lesser crime of simple assault would be in order. For that reason, Walls will be entitled, on remand, to an instruction on the lesser crime.
¶ 14. This brings the Court to the second issue raised by Walls in his appeal.
*488 IRVING, J., for the Court as to Issue II

II.

The Second Issue: The Status of Walls as a Habitual Offender
¶ 15. The issue here is not whether Walls had been convicted of two felonies prior to his current conviction; he concedes as much. The issue is whether those prior convictions arose out of separate incidents at different times as required, for habitual offender status, by Miss.Code Ann. § 99-19-81(1972). If they arose out of separate incidents, then Walls was properly sentenced as a habitual offender because as stated, he concedes the fact that he, at the time of his conviction in the case at bar, had been convicted on pleas of guilty to two prior felonies. On the other hand, if those convictions arose out of one incident, his sentence as a habitual offender in the case before us must be set aside. The facts giving rise to his prior felony convictions are these.

Walls's Version of the Facts Undergirding the Prior Felonies
¶ 16. Walls and a friend, David Wallace, were traveling together down Highway 7. Walls was driving. They were stopped by troopers George L. White and James Watts who suspected Walls of driving under the influence. Walls passed a sobriety test administered on the side of the road. However, the officers decided to carry him to jail to administer a Breathalyzer. The officers handcuffed Walls and placed him in the back seat of a patrol car being driven by Trooper White. Walls immediately climbed into the front seat and would not allow Trooper Watts to enter the patrol car. Watts, who is related to Walls, then agreed to drive Walls's car to the station. White proceeded to drive Walls to the station. Watts and Walls's passenger, Wallace, followed in Walls's car. A short distance along the way, White stopped the car because Walls started kicking the dash and windshield. Walls related the rest of what happened as follows:
I did it to the window and I cracked it well now, I really done it. So I just proceeded to take the window the rest of the way out and that is when James Watts finally realized there was something going on in the car. One I hadn't assaulted no one at this time that he pulled me over and my legs were still up there and I don't think the windshield, I was still pushing on it and he grabbed my legs and held them down and that is what happened.
¶ 17. Additionally, Walls admitted that the officers called for assistance to help calm him down but denied that a fight occurred.

The State's Version
¶ 18. The State's account of the incident was offered through the testimony of trooper George L. White as follows:
Officer James Watts and I were headed northbound on 7 and we observed a vehicle coming towards us at a high rate of speed and we pulled the vehicle over and I went to the drivers side of the vehicle, asked for the subject that was driving the vehicle for his license, which he said he didn't have and then later said he thought they were suspended. During that time I smelled alcohol on the subject. I went back to my vehicle to run a check on his drivers license; during that time Officer Watts was checking him to see if he was under the influence. During the checking of the license I just happened to look back up and they were sort of wrestling on the trunk of the vehicle.
* * * *
And he and Officer Watts were wrestling. So I exited the vehicle and helped assist Watts as far as getting the handcuffs on him. We brought him back to the patrol unit and we were going to secure him in vehicle and the wrestling match started again. We finally got him *489 secured in the front seat of Officer Watts patrol car and got him settled down. Then I drove Officer Watts vehicle and Trooper Watts brought his vehicle in with the other guy that was passenger that I can't recall his name at this time. During the time on the way to the detention center we arrived at North Lamar out there at the four way and 30. We proceeded towards the Beacon when Mr. Wall he just started talking and he just went berserk. Started kicking my windshield out coming at me with his feet. By the time I knew it half the windshield was out. So I pulled over into the parking lot. I believe insurance company parking lot across from the Beacon restaurant and a minute or two James arrived and we were trying to secure him and we needed more help so I called for assistance and I believe Chief Bramlett and Officer Jenkins and two other officers arrived on the scene, and we struggled and finally got restraints on him.
Based on the foregoing facts, Walls pled guilty to assault on George L. (Leslie) White and James Watt. He was not charged with assault on either of the officers who provided assistance.
¶ 19. In our search for the answer to the question we face, we view the following cases as providing some guidance: Pittman v. State, 570 So.2d 1205 (Miss.1990), Nicolaou v. State, 534 So.2d 168 (Miss. 1988), and Riddle v. State, 413 So.2d 737 (Miss.1982 ). We believe these cases are supportive of the view that Walls's predicate offenses, for habitual offender status, arose out of a single incident or a common temporal nucleus of operative fact and do not qualify as separate incidents at different times.
¶ 20. In Riddle, Roy Lee Riddle was indicted for and convicted of the kidnap and rape of an eight year old female child, and for the burglary at night of the dwelling within which the child was sleeping. Id. at 738. Apparently, the trial judge treated two of the offenses as the predicate offenses and sentenced Riddle as a habitual offender. The State conceded, and the Mississippi Supreme Court agreed, that the habitual offender statute was inappropriately applied. Id. It seems clear to me that before Riddle could rape and kidnap the child he first had to commit burglary of the dwelling. Once he broke and entered with the intent to rape or kidnap, the burglary was completed, thus one crime was complete. When he raped the child a second crime was completed, and clearly there was some intervening time between the rape and the burglary. Finally, he kidnaped the child, and again, clearly some time elapsed between the raping and the kidnaping, for he could not be raping and kidnaping at the same time. Despite the intervention of time between the various offenses, the Riddle court and the prosecution agreed that the offenses did not constitute separate offenses for purpose of the habitual offender statute even though they could be, and were, prosecuted as three separate offenses. Id.
¶ 21. We cannot distinguish the separateness of the offenses in the case sub judice, from the separateness of the offenses in Riddle. In the case before us, Walls first struggled with two officers when he was being arrested and placed in the patrol car. Once inside the patrol car, he continued to demonstrate his displeasure at being hauled in by attacking the windshield and dash of the patrol car. This made it necessary for Trooper White to pull over. In the effort to bring Walls under control, he was assisted by Officer Watts, whom he had assisted earlier, along with two other officers, neither of whom was the victim of the assault charges to which Walls pled guilty. The same two officers were involved with the first and second scuffle. While Riddle involved three offenses committed in proximity of time and place, and our case involves only two offenses committed in proximity of time and place, the two cases cannot be distinguished on that basis because the problem in Riddle was not that the third *490 offense was inseparable from the first two but that the three were inseparable from each other.
¶ 22. In Nicolaou, Allen Nicolaou was convicted of murdering Charles Allan Poole. He was sentenced as a habitual offender. The predicate offenses relied upon by the State to support sentencing as a habitual offender were two previous murders, a robbery and the kidnaping of two females, all committed by Nicolaou on the same day. Nicolaou, 534 So.2d at 173. On the day the predicate offenses were committed, Nicolaou first murdered two men, took the car of one of the men, then robbed a convenience store and kidnapped two females. The State conceded that the two murders should be considered as one offense for purpose of the habitual offender statute. However, the State argued, and our supreme court agreed, that the robbery and kidnapping were separate from the murders. Id. The two predicate murders in Nicolaou, which were considered as one offense, are more similar to the two predicate assaults in our case. While the Nicolaou opinion does not give any details of how the murders occurred, it is clear that Nicolaou killed two people first and that the two killings were conceded to be one offense for purpose of the habitual offender statute. The Nicolaou opinion, while not specifically saying so, appears to indicate that the robbery and kidnaping, like the two murders, constituted a single offense for purpose of the habitual offender sentencing statute. In any event, it is apparent to me that the killing of two people, taking the car of one of them, driving some place to a convenience store, robbing it and kidnaping two females constitute at least two separate crimes at separate times. However, it takes more than a stretch of imagination or twist of logic to equate that fact scenario with the facts of this case where the defendant got into a scuffle with law enforcement officers and assaulted one, was handcuffed, placed in a patrol car and started kicking the window out resulting in another scuffle and another assault, all before reaching the jail and a short distance from the first scuffle.
¶ 23. In Pittman, 570 So.2d at 1205, Bobby Lee Pittman was convicted of burglarizing one Cohen store, and because he had been previously convicted of burglary of Carrie Dotson Elementary School and larceny of Wilson Elementary School, he was sentenced as a habitual offender. On appeal, he argued that the two predicate offenses were not sufficiently separate one from the other to permit application of the habitual offender statute. The two predicate offenses used to sentence the defendant as a habitual offender occurred on the same day although the record was silent as to whether they occurred on one trip to the school complex or two. The two schools were located adjacent to each other. Our supreme court affirmed his sentence as a habitual offender and observed:
A person who on three separate occasions has pursued a criminal design should be dealt with severely, more so than on his first or even second offense. Three separate criminal acts suggest a likely-to-be-repeated habit of behavior such that the community ought intervene. But before such behavior should be labeled habitual, it would seem that the events should be sufficiently separate that the offender's criminal passions may have cooled so that he has time to reflect, and if after such an interval the individual forms and actualizes a new criminal design, and then does so a third time, he should be met with all of the power of the public force. Conversely, two offenses committed in rapid succession do not suggest the same repetitiveness of criminal design such that the offender may be thought predictably habitual thereafter, or deserving of severe sanction.
* * * *

No doubt, if Pittman broke and entered one room in the Wilson Elementary School and, finding nothing of value, *491 then moved to another room in the same school and thereafter stole the three television sets from that room, we would consider the union of these acts sufficient that they would constitute but a lone incident under the statute. The record before us, however, reflects that the Dotson Elementary School and the Wilson Elementary School are separate schools, notwithstanding their proximity and common use of the auditorium and cafeteria. Even if on February 13, 1987, Bobby Ray (sic) Pittman burglarized the Dotson School and then stole the color television sets from the Wilson School, as quickly as one could physically accomplish these acts, one after the other, we would be obliged to hold these "separate incidents at different times."
Pittman, 570 So.2d at 1206-07 (emphasis added).
¶ 24. It seems to us that the predicate offenses in the case before us were committed in a scenario more analogous with the room to room example discussed in Pittman, which warrants a finding of one offense, rather than the school to school situation which warrants a finding of separate offenses. Also, the scenario in the case at bar, out of which the predicate offenses arose, is more akin to the scenario out of which the double murders arose in Nicolaou, and out of which the burglary, rape and kidnaping arose in Riddle. Since both murders in Nicolaou and the burglary, rape and kidnaping in Riddle were, for purposes of the habitual offender statute, found to be one offense, we can think of no good reason why an assault, growing out of a scuffle with a law enforcement officer attempting to make an arrest, and an assault growing out of a continuation of that scuffle after the arrest is effectuated, do not likewise constitute a single offense for purposes of the habitual offender statute. Accordingly, we hold that Walls's prior predicate convictions arose out of a single incident at the same time and do not qualify for habitual sentencing in this case. We therefore reverse Walls's habitual sentence, and if he is again convicted on remand, he should be sentenced consistent with the holding here.
¶ 25. THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT OF CONVICTION OF AGGRAVATED ASSAULT IS REVERSED AND REMANDED FOR A NEW TRIAL AT WHICH, IN THE EVENT OF A CONVICTION, THE DEFENDANT MAY NOT BE SENTENCED AS A HABITUAL OFFENDER UNDER SECTION 99-19-81OF THE MISSISSIPPI CODE BASED ON THE TWO PREVIOUS FELONY CONVICTIONS SET OUT IN THE INDICTMENT. COSTS OF THIS APPEAL ARE ASSESSED TO LAFAYETTE COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., DIAZ, IRVING, AND THOMAS, JJ., CONCUR. LEE, J., CONCURS AS TO ISSUE II. BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PAYNE, J. LEE, J., JOINS AS TO ISSUE I. MOORE, J., NOT PARTICIPATING.
BRIDGES, J., DISSENTING:
¶ 26. I respectfully dissent from the majority's conclusion that this case must be reversed and remanded for a new trial in order to allow the jury an opportunity to decide whether or not the knife, which was used as a bludgeoning device rather than to stab or cut, was still capable of being classified as a deadly weapon. A thorough review of the record reveals that this is not a case in which, upon the evidence, the jury could have rationally found Walls guilty of simple assault and not guilty of the crime charged. Moreover, I disagree with the majority's opinion that "the knife was not used to inflict injury in the manner one would normally associate with a knife assault," and thus, "there was a legitimate issue of fact as to whether the knife was a deadly weapon." Consequently, I cannot join the majority's disturbance of the jury's verdict and find that the trial *492 court properly declined to submit the issue of simple assault to the jury.
¶ 27. The Mississippi Supreme Court has clearly delineated the circumstances under which a defendant is entitled to have the jury pass on a lesser-included-offense instruction. The court has held that "the submission of a lesser degree of an included crime is justified only where there is some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one...." Hoops v. State, 681 So.2d 521, 535 (Miss.1996) (quoting Rowland v. State, 531 So.2d 627, 632 (Miss.1988)). Consequently, whether a defendant on trial for aggravated assault is entitled to a lesser-included-offense instruction on simple assault "turns on whether there is an evidentiary basis for it." Jackson v. State, 684 So.2d 1213, 1230 (Miss.1996).
¶ 28. My analysis of Walls's claim is guided by our supreme court's opinion in Hutchinson v. State, 594 So.2d 17 (Miss. 1992). In Hutchinson, as with the case at bar, the defendant was on trial for aggravated assault and requested that the jury be given a lesser-included-offense instruction on simple assault. Our supreme court analyzed Mississippi's aggravated assault and simple assault statutes, concluding that:
[f]rom the language of these statutes, it becomes apparent that aggravated assault is a carbon copy of simple assault, with the exception that aggravated assault has added the words "... with a deadly weapon...." This suggests a statutory scheme where conduct which is simple assault under [s]ection 97-3-7(1)(a) becomes aggravated assault under [s]ection 97-3-7(2)(b) when "done with a deadly weapon." The scheme is completed when we realize that a subsequent subsection of the simple assault definition includes the negligent injury to another with a deadly weapon. No evidence suggests or even hints that [the defendant] acted negligently.
Hutchinson, 594 So.2d at 19 (citations omitted). The court then held that Mississippi's statutory scheme precluded an intentional assault with a deadly weapon from ever being simple assault. Id. at 20 (emphasis added). In arriving at this conclusion, the court noted that "the statute draws a distinction between intentionally inflicted bodily injury, which is simple assault, and a like, intentionally inflicted injury `with a deadly weapon,' which is defined as aggravated assault." Id. The court went on to hold that "[t]he further distinction between negligently inflicted injury with a deadly weapon, which are simple assaults, and intentionally inflicted bodily injuries with a deadly weapon, which are aggravated assaults, confirms this view." Id. The court concluded that the defendant's use of a deadly weapon removed the case from our simple assault statute. Hutchinson, 594 So.2d at 20. Accordingly, under Mississippi law, "[o]nce a deadly weapon is introduced, the distinction between simple and aggravated assault, as defined by Miss.Code Ann. §§ 97-3-7(1) and (2), hinges upon whether the injuries were inflicted negligently or intentionally." Jackson, 684 So.2d at 1230 (citing Hutchinson, 594 So.2d at 20).
¶ 29. The majority states that "a knife is a device whose designed purpose, when used as a weapon, is to cut or stab. There is no evidence in this record that Walls attempted to inflict any injury on Kesler in this manner." As such, the majority concludes that "there was no proof that this knife was constructed in such a way that the handle constituted a particularly dangerous bludgeoning tool." I disagree. Furthermore, I am deeply troubled by the majority's reference to this weapon as a mere "knife." This particular weapon would be more appropriately labeled as a "dagger" or a "dirk." The weapon used in this case was not the type that could easily be mistaken for a pocket knife. Nor could it ever be mistaken as a common kitchen utensil that characteristically has a wooden end. A mere inspection of the photographs of this weapon clearly shows that *493 the handle of this knife, when used as a bludgeoning tool, certainly was capable of producing serious bodily injury as to constitute a deadly weapon within the meaning of the statute. Walls's weapon that he used to assault Kesler was a large, long double-edged Willis and Fink knife with a decorative gold metal end, containing several pointed tips, any of which could produce serious bodily injury. (See the attached exhibit.) This was no ordinary knife. Thus, just as a pistol used to "pistol whip" a person would still be classified as a deadly weapon despite the fact that the pistol was "not used for its designed purpose," or as a hammer's end would still be classified as a deadly weapon, a knife handle such as the one here, used in the manner it was here, should also be classified as a deadly weapon. Therefore, I disagree with the majority's statement that "the method in which this knife was allegedly used renders it essentially indistinguishable from any other blunt instrument capable of being wielded as a weapon." For one thing, this weapon was not a "blunt" instrument, and it certainly was distinguishable from other blunt instruments capable of being wielded as a weapon. Upon viewing the photograph of this weapon and from Kesler's testimony, it is clearly apparent that this weapon's design would constitute it as a deadly weapon, irrespective of which end was used, and that Walls's use of the knife excluded it from the lesser-included-offense of simple assault.
¶ 30. Furthermore, the majority's opinion states that even though Kesler went to see her doctor immediately, there was no evidence that she suffered from any substantial head injuries as a result of the blows administered by Walls with the knife handle. In Hutchinson, 594 So.2d at 19, the supreme court stated that an instruction on simple assault as a lesser-included-offense of aggravated assault was not required where injuries sustained by the victim could not reasonably be characterized as less than serious bodily injuries. "[J]ust because the injuries may be characterized as slight does not mean the case is automatically one of simple assault. Rather, here, as always, the offense is defined by the statute as the legislature has given us and read it as fairly and sensibly as we may." Id. Under the statute, it is enough that the use of the weapon constitutes "a means likely to produce [either] death or serious bodily harm." Jackson v. State, 594 So.2d 20, 24 (Miss.1992). It is not necessary to prove that the victim suffered serious bodily injury. Id. "Mere `bodily injury' is sufficient so long as it was caused with `other means likely to produce death or serious bodily harm.'" Id.
¶ 31. Kesler testified that Walls kicked in the door, came at her, and started beating her with his fist. He then drug her through the trailer by her hair from the living room, down the hall back to the bedroom, and then back up to the front of the trailer. Kesler stated that Walls then "pulled the knife and he kicked me in my lower back and in the back of my head and he hit me with the knife, the handle of the knife in the head, repeatedly." He then banged her head against the table. Kesler stated that he gathered her things and forced her to leave with him. Kesler testified that after the police came she went immediately to her family doctor. The record reads as follows, in pertinent part:
Q: Did you have any cuts[,] bruises or abrasions?
A: Yes, I had a cut here and above my eye and felt like my lower back bone was fractured. I couldn't hardly walk or hear or see at that point.
Q: Were your eyes swollen?
A: Yes, sir.
Q: Go ahead. I'm sorry. What else did Dr. Hopkins tell you?
A: He just-that is it. I just basically went home and took like Advil or something for the pain.
Q: Did you have to stay at home because of the pain?

*494 A: Yes, sir, I had to stay home for about 4 days from work. I couldn't hardly walk when I left there.
¶ 32. Additionally, there was testimony from the police officers on the scene that Kesler was covered in blood, that blood was on the coffee table as well as on papers on the coffee table, and that blood was on the carpet. Officer Hill stated that Kesler's face was "covered with blood. The front of her clothes were covered with blood. She looked distraught." Furthermore, photographs were taken that showed how the door had been forced open as well as pictures that showed the knife scabbard laying on the stove covered in blood. Thus, even though the majority attempts to infer that this assault did not cause any substantial head injuries, it is quite apparent from the evidence that this assault did produce a substantial amount of blood.
¶ 33. The question to be asked in this case is whether the statutory scheme precludes an intentional assault with a knife such as that used here ever being simple assault. I think it does. Even viewing the evidence in the light most favorable to Walls, I believe that no reasonable jury could have found him innocent of aggravated assault, yet guilty of simple assault. It is my opinion that Walls's use of this particular kind of knife and his deliberate wielding of this deadly weapon removes this case from the simple assault provision of the statute. I therefore respectfully dissent from the majority's finding that the trial judge erroneously refused Walls's request for a lesser offense instruction on simple assault.
¶ 34. Additionally, as to Walls's second issue on appeal, I find no error in the trial court's decision to sentence Walls as an habitual offender. In relevant part, the habitual offender statute provides: "Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times...." Miss.Code Ann. § 99-19-81. "We have on several occasions held that `priors' arising out of incidents occurring on the same date may nevertheless be `separate incidents at different times' within Section 99-19-81." Pittman v. State, 570 So.2d 1205, 1207 (Miss.1990). There need be little separation between the two crimes to satisfy the statutory requirements.
¶ 35. In Nicolaou v. State, the defendant had embarked on a crime spree that involved two murders followed by two kidnapings committed in the course of fleeing the murder scene. Nicolaou v. State, 534 So.2d 168, 173 (Miss.1988). The court held that the murders were related to the same incident but that the kidnapings were separate incidents from the murders for considerations of habitual offender sentencing. Id.
¶ 36. In Pittman, the defendant burglarized, apparently in rapid succession, two school buildings that shared the same campus but operated as different schools under separate names and with different administrations. Pittman, 570 So.2d at 1205-06. Again, the court held that these two break-ins, even could it be shown that they were done "as quickly as one could physically accomplish these acts," would nonetheless, be separate incidents for purposes of habitual offender analysis. Id. at 1207.
¶ 37. Based on the Mississippi Supreme Court's prior interpretation of the statute, I am persuaded that the trial court was correct in finding these two prior assault convictions arose out of separate incidents. Multiple crimes committed during the course of a series of related events may constitute separate and distinct offenses for purposes of Section 99-19-81. Thus, as to Walls's second issue on appeal, I respectfully dissent and would affirm the trial court's decision to sentence Walls as an habitual offender.
*495 PAYNE, J., JOINS THIS SEPARATE OPINION. LEE, J., JOINS AS TO ISSUE I.